**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ZACHARY KLEIN, et al., | ) | CASE NO. 5:25-CV-01999 |
| | ) | |
| Plaintiffs, | ) | DISTRICT JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | CARMEN E. HENDERSON |
| | ) | |
| A1 DEVELOPMENT, LLC D/B/A | ) | |
| FUNRIZE SOCIAL GAMING MEDIA | ) | REPORT AND RECOMMENDATION |
| PLATFORM, | ) | |
| | | |
| Defendant. | | |

Pending is Defendant A1 Development, LLC d/b/a Funrize Social Gaming Medial

Platform's ("A1") Motion to Dismiss for Lack of Personal Jurisdiction. (ECF No. 11). Plaintiffs

filed a Memorandum in Opposition to Defendant's Motion to Dismiss for Lack of Personal

Jurisdiction. (ECF No. 15). Defendant then filed a Reply in support of Motion to Dismiss. (ECF

No. 17). Also pending is Defendant's Motion to Compel Individual Arbitration. (ECF No. 12).

Plaintiffs filed a Memorandum in Opposition to Defendant's Motion to Compel Individual

Arbitration. (ECF No. 16). Defendant subsequently filed a Reply in support of Motion to Compel

Individual Arbitration. (ECF No. 18).

## I.      Background

In their Complaint, Plaintiffs, Zachary Klein ("Klein"), Amber Papp ("Papp"), and Tracy

Tanner ("Tanner"), individually and on behalf of all others similarly situated brings this class

action complaint including the following claims, (1) declaratory judgment that A1's Terms of

Service are unenforceable under 11 U.S.C. § 1955, et seq. and 28 U.S.C. §§ 2201, et seq., (2)

declaratory judgment that the contract is unenforceable under O.R.C. § 2721, et seq. and O.R.C.

1

§ 3763.01 (O.R.C. § 3763.01, et seq. hereafter the "Ohio Loss Recovery Act" or "LRA"); (3) recovery under the LRA per O.R.C. § 3763.02; (4) recovery under the LRA per O.R.C. § 3763.04; (5) violations of the Ohio Consumer Sales Practices Act, O.R.C. § 1345, et seq.; and (6) unjust enrichment. (ECF. No. 1 at 14–20). Plaintiffs, Klein and Papp, represent they are residents of Summit County, Ohio. *Id.* ¶¶ 1–2. Plaintiff Tanner represents that she is a resident of Medina County, Ohio. *Id.* at ¶ 3. Defendant is a limited liability company organized under the laws of Wyoming, with its principal place of business in Afton, Wyoming. *Id.* at ¶ 4.

The following facts are drawn from the Complaint and are construed in a light most favorable to Plaintiffs to resolve the present motion to dismiss.

Defendant owns and operates online gaming platforms, including the website[1] and mobile application known as Funrize (the "Platform"), and develops games designed to simulate slot machines and other gambling games. (ECF No. 1, ¶ 17). Though Defendant's online gaming is free to play, the Platform utilizes two forms of virtual currency referred to as "gold coins" and "sweeps coins." (ECF No. 1, ¶ 18) (ECF No. 11, at 7). Gold coins may be purchased by users and are also provided upon signing up and during gameplay. *Id.* Gold coins cannot be redeemed for real-world currency but may be used to extend playing time without requiring additional purchases. *Id.*

Although sweeps coins cannot be purchased directly, users who purchase packages of gold coins receive a specified number of sweeps coins with those purchases. *Id.* Unlike gold coins, sweeps coins may be redeemed for real-world currency. *Id.* Each Plaintiff spent money to play Defendant's games within the six months preceding the filing of the Complaint and earned sweeps coins while playing those games. *Id.* ¶¶ 21–22. Plaintiff Zachary Klein is a resident of

---

[1] Accessible at https://funrize.com/ (last visited March 25, 2026).

Ohio who accessed Defendant's games through the Funrize mobile application. (ECF No. 1, ¶ 29). On August 13, 2025, while located in Ohio, Klein accessed his account through the application and played a game called, "3 Hot Chilli Peppers." *Id.* at ¶ 30. During that session, Klein obtained winnings in excess of 100,000 coins. *Id*. When Klein attempted to redeem those winnings, Defendant limited his redemption to a cash payment of $100.00. *Id.* at ¶ 31. Between August 13, 2025, and August 16, 2025, Klein communicated with Defendant's representatives through the application's support system and by email regarding his inability to redeem the full amount of his winnings. *Id.* at ¶ 32. Defendant informed Klein that his winnings were limited pursuant to certain "Funrize Award Rules," including a rule treating his entries as promotional entries that limited redemption to $25.00 and another rule providing that winnings may be cancelled in the event of a game malfunction. *Id.* Klein asserts that he was not provided with a copy of the Funrize Award Rules prior to registering for Defendant's application. *Id.* at ¶ 33.

Plaintiff Amber Papp, also a resident of Ohio, accessed Defendant's games through the Funrize mobile application. (ECF No. 1, ¶ 34). On August 13, 2025, while located in Ohio, Papp accessed her account through the application and played a game identified as "3 Pot Dragons." *Id.* at ¶ 35. Papp attempted to redeem approximately 700,000 coins for currency but was unable to do so. *Id.* at ¶ 37. After contacting Defendant's representatives regarding the issue, she was informed that the Funrize Award Rules applied to her winnings. *Id.* at ¶ 38. Papp asserts that she was not provided with a copy of those rules prior to signing up for Defendant's application and that she has been unable to redeem any of her sweeps coins since August 13, 2025. *Id.* at ¶¶ 39–40.

Plaintiff Tracy Tanner is also a resident of Ohio who accessed Defendant's games through the Funrize app and spent money to play Defendant's games within the six months preceding the filing of the Complaint. (ECF No. 1, at ¶¶ 41–42).

Plaintiffs seek injunctive relief, declaratory relief, attorney's fees and costs, monetary damages, and prejudgment interest. (ECF. No. 1, at 20).  This Court recommends the District Court deny Defendant's motion to dismiss for lack of personal jurisdiction and grant Defendant's motion to compel individual arbitration for the reasons set forth below.

## II. Defendants' Motion to Dismiss for Lack of Personal Jurisdiction

### a. Standard of Review

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, "[t]he party seeking to establish the existence of personal jurisdiction bears the burden to establish such jurisdiction, 'over each defendant independently.'" *Beydoun v. Wayaniya Rests. Holding, Q.S.C.*, 768 F.3d 499, 504 (6th Cir. 2014) (quoting *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 904 (6th Cir. 2006)). If a court rules on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction prior to trial, "it has the discretion to adopt any of the following courses of action: (1) determine the motions based on affidavits alone; (2) permit discovery, which would aid in resolution of the motion; or (3) conduct an evidentiary hearing on the merits of the motion." *Intera Corp. v. Henderson*, 428 F.3d 605, 614 n.7 (6th Cir. 2005). "[T]he decision whether to grant discovery or an evidentiary hearing before ruling on a 12(b)(2) motion is discretionary." *Burnshire Dev., LLC v. Cliffs Reduced Iron Corp.*, 198 F. App'x 425, 434 (6th Cir. 2006).

In their Motion in Opposition, Plaintiffs have requested an evidentiary hearing. Having reviewed the parties' briefs and declaration, the Court finds a hearing will not assist the Court and the Defendants' Motion may be resolved by the parties' submissions.

Where a court rules on a jurisdictional motion to dismiss made pursuant to Rule 12(b)(2) without conducting an evidentiary hearing, the court must consider the pleadings and affidavits in a light most favorable to the plaintiff.

*CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996). To defeat such a motion, a plaintiff need only make a *prima facie* showing of jurisdiction, which can be met by "establishing with reasonable particularity sufficient contacts between [the defendants] and the forum state to support jurisdiction." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002) (quoting *Provident Nat'l Bank v. Cal. Fed. Savings Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987)). A court ruling on a Rule 12(b)(2) motion does not weigh the contradicting assertions of the party seeking dismissal but may consider a defendant's undisputed factual assertions. *See CompuServe*, 89 F.3d at 1262; *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991); *NTCH-West Tenn, Inc. v. ZTE Corp.*, 761 F. App'x 485, 488 (6th Cir. 2019). "Dismissal in this procedural posture is proper only if all the specific facts which the plaintiff [ ] alleges collectively fail to state a *prima facie* case for jurisdiction." *CompuServe*, 89 F.3d at 1262; *see also Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997).

"In a diversity case, a federal court can exercise personal jurisdiction over a defendant if jurisdiction is (1) authorized by the law of the state in which it sits, and (2) in accordance with the Due Process Clause of the Fourteenth Amendment." *Tharo Systems, Inc. v. Cab Producktechnik GMBH & Co., KG*, 196 F. App'x 366 (6th Cir. 2006). Jurisdiction under Ohio's long-arm statute is governed by Ohio Rev. Code § 2307.382 and the due process inquiry requires determining "whether the facts of the case demonstrate that the non-resident defendant possesses such minimum contacts with the forum state that the exercise of jurisdiction would comport with

5

'traditional notions of fair play and substantial justice.'" *Theunissen*, 935 F.2d at 1459 (quoting *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945)).

### b.  Law and Analysis

Defendant A1 argues that this Court lacks specific personal jurisdiction over them because (1) A1 does not reside in Ohio, (2) A1 does not have sufficient contacts with Ohio and has not purposefully availed itself of the laws of Ohio, (3) A1 has no systematic and continuous contacts with Ohio nor has it targeted or directed its activities, or otherwise advertised, towards residents of Ohio (4) exercising personal jurisdiction over Defendant would violate notions of "fair play and substantial justice." (ECF No. 11, at 8–20).

Plaintiffs contend that the Court has specific personal jurisdiction over Defendant because (1) A1 transacted business in Ohio under Ohio Rev. Code § 2307.382(A)(1), Ohio's long arm statue, and (2) exercising jurisdiction over A1 comports with due process. (ECF No. 15, 10–15).

Personal jurisdiction may be either general or specific in nature, depending on the nature of the contacts at issue. *CompuServe*, 89 F.3d at 1263. Here, Plaintiffs base their action on A1's interactions with the forum and therefore seek to establish specific jurisdiction over A1. Specific personal jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quotation marks and bracket omitted); *see also Gerber v. Riordan*, 649 F.3d 514, 517 (6th Cir. 2011) (specific jurisdiction is proper "in a suit arising out of or related to the defendant's contacts with the forum.") (citation omitted). Specific personal jurisdiction comports with due process under the Constitution when "the defendant has sufficient

6

minimal contacts such that traditional notions of fair play and substantial justice are not offended." *Intera Corp.*, 428 F.3d at 615–616 (quotation marks and citation omitted).

A court's personal jurisdiction analysis begins with the "long-arm" statute of the state in which the court sits. *CompuServe*, 89 F.3d at 1262. The Ohio General Assembly amended Ohio's long-arm statute in April 2021 to extend the reach of Ohio's long-arm statute to the limits of the U.S. Constitution. Before the amendment, "Ohio's long-arm statute consisted of a list of enumerated acts set forth in § 2307.382(A), followed by an admonition in § 2307.382(C) that '[w]hen jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him.'" *AmaTech Grp. Ltd. v. Fed Card Servs.*, LLC, 2022 WL 44674, at *4 (S.D. Ohio Jan. 5, 2022) (quoting Ohio Rev. Code Ann. § 2307.382 (West 2019)). Based on that language, "courts routinely noted that Ohio's long-arm statute did not extend jurisdiction to the fullest extent that the Due Process Clause allows." *Id.* The amendment, however, revised subsection (C) to read: "In addition to a court's exercise of personal jurisdiction under subsection (A) of this section, a court may exercise personal jurisdiction over a person on any basis consistent with the Ohio Constitution and the United States Constitution." Ohio Rev. Code § 2307.382(C).

Since its revision, several district courts have interpreted the amendment, and the courts disagree as to its effect. Some courts "have concluded that Ohio's long-arm statute now extends personal jurisdiction to the fullest extent that the U.S. Constitution permits." *AmaTech Grp. Ltd.*, 2022 WL 44674, at *5; *see e.g.*, *In re E. Palestine Train Derailment*, 2024 WL 1094616 (N.D. Ohio Mar. 13, 2024) ("In April 2021, the Ohio Legislature amended Ohio's long-arm statute to make it co-terminous with the limits of due process under the United States Constitution."). Other courts "have concluded that the purpose of the new language in § 2307.382(C) is merely to

7

allow for 'general jurisdiction' over non-resident defendants in appropriate circumstances." *AmaTech Grp. Ltd.*, 2022 WL 44674, at *5; *see e.g.*, *Spyglass Grp., LLC v. Genesis Health Clubs Mgmt., Inc.*, 2022 WL 17251820, at *4 (N.D. Ohio Nov. 28, 2022) ("This amended language appears to allow the exercise of general jurisdiction over non-resident defendants where the Constitution permits. But it does not collapse the specific-jurisdiction analysis into a single due-process inquiry.") (citations omitted).

Neither party addresses the effect of the 2021 amendment. Because it is unresolved whether Ohio's long-arm statute is co-extensive with federal constitutional limits, the Court will separately analyze jurisdiction under first the Due Process Clause and then Ohio's Long Arm Statue. *See Baker v. Bensalz Prod. Inc.*, 480 F. Supp. 3d 792, 801 (S.D. Ohio 2020) ("The Plaintiff must clear both statutory and constitutional hurdles, and the Court is free to consider them in either order."); *see also Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991).

### i.      Personal Jurisdiction is established under the Due Process Clause

In addition to determining whether Ohio's long-arm statute confers personal jurisdiction over A1, this Court must also analyze whether exercising such jurisdiction over A1 would deprive them of the right to due process pursuant to the Fourteenth Amendment. *U.S. Sprint,* 68 Ohio St. 3d 181 at 183–184. The Sixth Circuit utilizes a three-pronged test for evaluating whether the proposed exercise of personal jurisdiction comports with due process considering, (1) whether the defendant purposefully availed himself of the privilege of acting in the forum state or causing a consequence in the forum state; (2) whether the plaintiff's cause of action arises from or relates to the defendant's activities in the forum state; and (3) whether acts of the defendant or the consequences caused by the defendant have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant

reasonable. *See Beydoun*, 768 F.3d at 505. Plaintiffs have satisfied all three elements for the reasons addressed below.

### ii.    The "purposeful availment" requirement

As noted above, the first step in determining whether the proposed exercise of personal jurisdiction comports with due process is assessing whether the defendant purposefully availed himself of the privilege of acting in the forum state or causing consequences there. The "purposeful availment" requirement is satisfied when the defendant's contacts with the forum state "proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State," and when the defendant's conduct and connection with the forum are such that he "should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–75 (1985) (quoting *World–Wide Volkswagen,* 444 U.S. at 297). Courts require purposeful availment to insure that "random," "fortuitous," or "attenuated" contacts do not cause a defendant to be haled into a jurisdiction. *Burger King Corp.,* 471 U.S. at 475 (citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774 (1984)).

Defendant argues that it has not purposefully availed itself of Ohio laws,

> [B]ecause it (i) has no employees who reside in or work from Ohio; (ii) has no physical presence in the State of Ohio and owns no property in the State of Ohio; (iii) is not registered to do business in the State of Ohio; (iv) does not target or direct any of its marketing or other business activities specifically towards Ohio residents; and (v) has never placed any advertisements in Ohio media outlets or otherwise specifically targeted Ohio residents with advertisements.

(ECF No. 11, at 18). Defendant further contends, "[w]hile Ohio residents are able to play A1's games, A1 cannot and should not be subjected to the jurisdiction of this Court merely by virtue of the random, fortuitous act of a user accessing the games through nationally available websites and applications." (ECF No. 11, at 19).

However, Defendant relies upon a case from outside of the Sixth Circuit to support their contention that this Court lacks personal jurisdiction over Plaintiffs' claims. (ECF No. 11, at 15–20); *Fair Gaming Advocates Georgia Inc. v. VGW Holdings Ltd.,* 2024 WL 5113237 (N.D. Ga. Dec. 13, 2024). In *Fair Gaming Advocates Inc.*, the court held that plaintiff did not establish specific or general personal jurisdiction over the defendant gaming company. 2024 WL 5113237, at *3–*5. First, the court held defendants were not subject to personal jurisdiction under Georgia's long arm statute, "[w]hile the Defendants casino gaming websites were certainly accessible by Georgia users and the Defendants accepted payments from Georgia users in order to play the games, the Court finds this limited interaction, without more, insufficient to satisfy the transacting business prong in O.C.G.A § 9-10-91(1)." *Id.* at *4. The court then found defendants were not subject to specific jurisdiction pursuant to the due process clause as, "… there was no 'occurrence' taking place in the state that ties into the Plaintiff's claim … At most, a contingent of Georgia residents happened to use and make purchases on the Defendants' casino gaming websites while residing in Georgia." *Id.* at *5. Consequently, the court found defendants' contacts were "random, fortuitous, or attenuated" in nature and the exercise of personal jurisdiction would not comport with the mandate of the due process clause. *Id.*

Unlike the Plaintiff in *Fair Gaming Advocates Inc.*, Plaintiffs here allege far more than the mere accessibility of Defendant's platform in the forum state. 2024 WL 5113237, at *3–*5. In contrast to the mere website use and transactions in *Fair Gaming Advocates Inc*., the Complaint alleges that through Defendant's website, users create accounts, purchase virtual currency, communicate with customer support, and attempt to redeem virtual currency for real world money. (ECF No. 1, ¶¶ 17–19, 34, 38, 41). The Complaint also sets forth that Defendant knowingly and repeatedly entered into commercial transactions with Ohio residents, including Plaintiffs Klein,

Papp, and Tanner, who each spent money on Defendant's platform over a sustained six-month period. 2024 WL 5113237, at *3–*5; (ECF No. 1, ¶¶ 21–22, 41–42). The Thus, A1's alleged conduct, greatly exceeds the conduct described in *Fair Gaming Advocates Inc.*, 2024 WL 5113237, at *3–*5.

Additionally, A1's games rely on the creation of an ongoing relationship created through its coin sale structure, with at least some users buying gold coins, wagering sweeps coins, playing games using sweeps coins, and attempting to redeem sweeps coins. (ECF No. 1, ¶¶ 17–19). A1 thus "contemplate[s] future consequences" when it sells coins to users, satisfying the purposeful availment analysis. *See Burger King*, 471 U.S. at 479; *see also Wilson v. Playtika, Ltd.*, 349 F.Supp.3d 1028 (W.D. Wash. 2018) (finding Defendant online gambling company purposefully availed itself of the state of Washington due to its ongoing relationships with customers created through repeated virtual coin sales). Therefore, A1's interactions with Ohio have been far from "random," "fortuitous," or "attenuated" contacts.

As noted by Plaintiffs, *Zippo* is not the controlling test under Ohio law for establishing personal jurisdiction over Defendants in internet cases as some Ohio courts adopt the standard, while others do not. *See e.g. Kauffman Racing Equip., L.L.C. v. Roberts*, 2008-Ohio-1922, ¶ 32 (5th Dist.) (finding *Zippo* instructive, but applying the specific jurisdiction framework focused on purposeful availment, relatedness, and reasonableness); *see e.g. Edwards v. Erdey*, 2001–Ohio–4367, ¶ 17–20 (Ohio Com. Pl.) (adopting the *Zippo* sliding scale test for analyzing the due process component of personal jurisdiction).

However, the standard set out in *Zippo* has been widely applied in this Circuit and supports this Court's exercise of personal jurisdiction over Defendant. 952 F.Supp. at 1119. The defendant in *Zippo*, Dot Com, utilized the domain names "zippo.com," "zippo.net", and

11

zipponews.com." *Id.* at 1121. The aforementioned websites contained information about Dot Com and allowed viewers to purchase new services. *Id.* Dot Com also issued passwords to users in order to make purchases. *Id.* The *Zippo* court then established a "sliding scale" test to determine when a defendant's online activities constitute personal availment,

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. *E.g. CompuServe, Inc. v. Patterson,* 89 F.3d 1257 (6th Cir.1996). At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise personal jurisdiction. *E.g. Bensusan Restaurant Corp., v. King,* 937 F.Supp. 295 (S.D.N.Y.1996). The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site. *E.g. Maritz, Inc. v. Cybergold, Inc.,* 947 F.Supp. 1328 (E.D.Mo.1996).

952 F. Supp. at 1124. The *Zippo* court concluded that Dot Com was subject to personal jurisdiction based on its interactive website (the "middle ground") because it "repeatedly and consciously chose to process Pennsylvania residents' applications and to assign them passwords," thereby purposefully availing itself of the privilege of doing business in Pennsylvania." *Id.* at 1126.

As noted by Defendant, the Sixth Circuit also utilizes the *Zippo* analysis when determining whether to exercise personal jurisdiction over non-residents defendants based on internet activity. (ECF No. 17, at 8). Defendant cites to *Neogen,* in which the plaintiff, Neogen Corporation ("NC"), was a Michigan company that operated a business involving the development and marketing of various products and services, including diagnostic test kits. *Neogen Corp.,* 282 F.3d at 886–87. Neogen operated at www.neogen.com. *Id.* at 886. The

defendant, Neo Gen Screening, Inc. ("NGS"), was a Pennsylvania company which performed diagnostic testing of blood samples and operated a website at *www.neogenscreening.com. Id.* at 887. In determining that NGS conducted business in Michigan, the Sixth Circuit noted that NGC provided residents of Michigan with passwords to access information on its website. *Id.* at 888–89. According to the Court, the "granting of passwords to Michigan residents as part of a contract for NGS's services is an interactive usage showing that NGS has intentionally reached out to Michigan consumers and enabled them to use NGS's services from Michigan." *Id.* at 890–91. As a result, the Court concluded that NGS had met the "purposeful availment" portion of the *Mohasco* test. *Id.* at 892.

In a similar case, the Sixth Circuit again found that personal jurisdiction was appropriate as a result of the defendant's alleged misappropriation of intellectual property by use of a website. In *Bird v. Parsons,* Bird, an Ohio resident, operated a computer software business called Financia, Inc. 289 F.3d 865 (6th Cir. 2002). A defendant, Parsons, a California resident, registered the domain name "efinancia.com" through defendant Dotster, Inc., a Washington resident. *Id.* at 868. Bird sued Parsons and Dotson in Ohio and the Sixth Circuit agreed that jurisdiction was appropriate following the reasoning in *Neogen. Id.* at 875–77.

Applying the *Zippo* sliding scale analysis to Defendant's platform, when construing the allegations in the light most favorable to Plaintiffs, this Court believes that A1 personally availed itself of the laws of Ohio. 952 F. Supp. 1119. Here, Defendant does far more than merely post passive information accessible to Ohio residents. Defendant operates an online gaming platform through its website, accessible at funrize.com, and Funrize mobile application. (ECF No. 1, ¶ 4 n.1). Through Defendant's website, users create accounts, purchase virtual currency, play casino-style games, communicate with customer support, and attempt to redeem winnings for real-world

currency. (ECF No. 1, ¶¶ 17–19, 29, 32, 34). A1 also "repeatedly and consciously" chose to process [Ohio] residents' account registrations on the Platform. (ECF No. 1, ¶¶ 29, 34); *Zippo*, 952 F. Supp. at 1124. These activities place Defendant squarely within the "middle ground" described in *Zippo*. *Id.* Like the defendants in *Neogen Corp,* and *Bird v. Parsons*, Defendant's platform permits users to register accounts and access information on its website. Plaintiffs allege that they accessed their accounts, played games, and communicated directly with Defendant through in-app messaging systems and email all while located in Ohio. (ECF No. 1, ¶¶ 29, 30, 32, 34, 35, 38, 41). Thus, under the "sliding scale" test set forth in *Zippo*, Defendant's online activities constitute personal availment of the forum of Ohio.

Moreover, purposeful availment requires the defendant's contacts with the forum state to proximately result from actions by the defendant that create a "substantial connection" with the forum State. *Doors On-Line v. Chandra*, 2023-Ohio-2018, ¶ 26 (3rd Dist.). Here, the alleged injuries arise directly from Defendant's contacts with Ohio. Plaintiffs Klein, Papp, and Tanner allege they accessed Defendant's platform while physically located in Ohio, engaged in gameplay, accumulated sweeps coins, communicated with Defendant's customer service representatives, and were subsequently denied the ability to redeem those coins based on rules they claim were not disclosed at the time of registration. (ECF No. 1, ¶¶ 30–33, 35–40). Thus, the underlying allegations, including repeated transactions, gameplay, and alleged wrongful withholding of winnings from Ohio financial accounts, all occurred in Ohio. *Id.* This stands in stark contrast to *Fair Gaming Advocates Inc.*, where the court found no meaningful connection between the defendants' conduct and the forum state beyond website access and transactions. 2024 WL 5113237, at *5.

14

Furthermore, Defendant's argument that it does not specifically target Ohio residents is not persuasive. A1 specifically concedes that, "it knew it had customers in Ohio and other states, and that it conducted marketing activities generally across the nation." (ECF No. 17 at 11). A1 also concedes that the purchases made by Ohio residents and the amount of Ohio based users on its Platform are not *de minimus*. (ECF No. 17 at 11); *see Alitalia-Linee Aeree Italiane S.p.A. v. Casinoalitalia.Com*, 128 F.Supp.2d 340, 350 (E.D. Va. 2001) (holding that a gambling website with just five Virginia members "interacts with Virginia consumers to such degree as to put [Defendant] on notice that it is purposefully directing its activities at Virginia and its residents."). Moreover, Defendant accepted payments from Ohio users, facilitated account creation from Ohio users, provided customer support services, and provided Ohio residents with virtual currency that may be redeemed for value. (ECF No. 1, ¶¶ 17–19, 29, 32, 34). Such conduct makes it foreseeable that Defendant could be haled into court in Ohio.

In sum, Defendant's contacts with Ohio are neither "random" nor "fortuitous," but instead reflect deliberate and "repeated transmission of computer files" directed towards Ohio residents. *Zippo*, 952 F. Supp. at 1124. Thus, the "purposeful availment" requirement is satisfied.

### iii.     The arising from Defendant's Activities in Ohio Requirement

The second prong of the Due Process requires a plaintiff to demonstrate "a causal nexus between the defendant's contacts with the forum state and the plaintiff's alleged cause of action." *Beydoun*, 768 F.3d at 507. The Sixth Circuit establishes a 'lenient' threshold for meeting this requirement." *Bird*, 289 F.3d at 875. Yet, the cause of action must have "a substantial connection with the defendant's in-state activities." *Id.*

Plaintiffs' claims arise out of A1's contacts with Ohio because the alleged injuries are directly tied to A1's operation of its online gaming platform within the state and its interactions

15

with Ohio residents. (ECF No. 1, at 14–19). A1 made its Platform accessible to users in Ohio, and the transactions giving rise to Plaintiffs' claims, including the purchase of virtual currency, participation in games of chance, and attempted redemption of winnings, occurred while Plaintiffs were using A1's Platform in Ohio. (ECF No. 1, ¶¶ 29–32, 34–37). Therefore, the claims and underlying facts of the case arise from defendant's contacts with the forum state.

### iv.     The reasonableness requirement

Finally, the exercise of personal jurisdiction over A1 is reasonable and fair. The third factor in the Sixth Circuit's test is whether there is a substantial enough connection between the acts of the defendant or consequences caused by the defendant and the forum state to make the exercise of jurisdiction over the defendant reasonable. *Air Prods. & Controls, Inc.*, 503 F.3d at 549. Notably, when "the first two criterion are met, 'an inference of reasonableness arises' and 'only the unusual case will not meet this third criteria.'" *Id.* at 554. For this factor, courts typically consider "(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the controversy." *Intera Corp.*, 428 F.3d at 618.

While Defendant would no doubt be burdened by defending this lawsuit in Ohio, given that they are based in Nebraska, they knew they were engaging in business with Ohio residents, including Plaintiffs, and they concede the number of Ohio residents that use their service is not *de minimus. See CompuServe,* 89 F.3d at 1268 ("It may be burdensome for [the defendant] to defend a suit in Ohio, but he knew when he entered into [business] with [the plaintiff] that he was making a connection with Ohio, and presumably he hoped that connection would work to his benefit."); *see also Ardent Techs. Inc. v. Advent Servs. LLC,* No. 3:23-CV-137, 2023 WL 5588547, at *8 (S.D.

Ohio Aug. 29, 2023) (quotation marks and citation omitted) ("[M]odern transportation and communication sufficiently ease this burden.").

Moreover, Ohio also has an interest in protecting its citizens. While this case does not involve an Ohio company, "Ohio has a legitimate interest in protecting the business interests of its citizens." *CompuServe,* 89 F.3d at 1268. Moreover, Ohio's interest in protecting its citizens is not decreased because this case involves individuals rather than a corporation. *See Perrow v. Grand Canyon Education, Inc.,* 2010 WL 271298, *6 (S.D. Ohio Jan. 15, 2010). Plaintiffs have an interest in obtaining relief in this case as they allege Defendant is engaged in illegal gambling under Ohio law and they suffered financial harm as they were denied redemption of their winnings. (ECF No. 1, ¶¶ 23–28, 32, 37). While Nebraska may have an interest in adjudicating a claim involving one of its businesses, "this interest does not override the other factors suggesting that personal jurisdiction in Ohio is reasonable." *Bird,* 289 F.3d at 876. Thus, the exercise of personal jurisdiction over A1 is reasonable and fair.

> **v.      Personal Jurisdiction is established under Ohio Rev. Code § 2307.382(A)(1)**

Plaintiffs allege that Ohio Rev. Code § 2307.382(A)(1) authorizes jurisdiction over Defendant. (ECF No. 15, at 10). Defendants cite the language of the statute in their brief, determine the long arm statute does not apply, but do not provide further discussion regarding its applicability. (ECF No. 11, at 12). Under Ohio Rev. Code § 2307.382: "(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's: (1) Transacting any business in this state...." Ohio Rev. Code § 2307.382. The Ohio Supreme Court has stated that Ohio Rev. Code § 2307.382(A)(1) is "very broadly worded and permit[s] jurisdiction over nonresident defendants who are transacting any business in Ohio." *Muzzin v. Brooks*, 859 N.E.2d 584, 588 (Ohio Ct. App. 8th Dist. 2006); *see*

*also Ky. Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 559 N.E.2d 477, 480 (Ohio 1990); *Dayton Superior Corp. v. Yan*, 288 F.R.D. 151, 160 (S.D. Ohio 2012). The Ohio Supreme Court has interpreted "transacting any business in Ohio" under Ohio Rev. Code § 2307.382(A)(1) and Civ.R. 4.3(A)(1) where the meaning of "transact" includes "to have dealings" and embraces in its meaning the carrying on or the prosecution of business negotiations that is broader than the word "contract" and may involve business negotiations which have been either in whole or in part brought to a conclusion. *See Kentucky Oaks*, 53 Ohio St.3d at 75; *Goldstein v. Christiansen*, 70 Ohio St.3d 232, 236, 638 N.E.2d 541 (1994) (citing *U.S. Sprint Communications Co. Partnership v. Mr. K's Foods, Inc.*, 68 Ohio St.3d 181, 185 (1994)) (the broad terms cannot be defined in a generalized manner and rely on the particular facts of a case). A physical presence in Ohio is not required for personal jurisdiction to exist over a nonresident defendant. *See Goldstein*, 638 N.E. 2d at 544.

However, under Ohio Rev. Code § 2307.382(A)(1), identical standards are used to interpret the "transacting any business" standard and the "purposeful availment" and "substantial connection with the forum State" prongs of the due process clause standard. *See Burnshire Dev., LLC v. Cliffs Reduced Iron Corp.*, 198 F. App'x 425, 432 (6th Cir. 2006). This Court found Defendant's personally availed themselves of the state of Ohio and found a substantial connection between Defendant's actions and the forum state. For the reasons set forth above, the Court concludes that Plaintiff has presented sufficient evidence to establish personal jurisdiction under (A)(1) of the Ohio long-arm statute.

While this Court finds specific personal jurisdiction over A1 to be appropriate, the Court now examines Defendant's motion to compel individual arbitration.

18

### III.           Defendant's Motion to Compel Individual Arbitration

A1 moves this Court to compel individual arbitration because all users of A1's platform accepted and agreed to arbitrate individually through the Terms of Use which includes a class action waiver. (ECF No. 12, at 3). Plaintiffs present the following arguments against arbitration: (1) no valid agreement to arbitrate was formed due to a lack of clear assent, ambiguity, and a lack of proof of Plaintiffs' assent to the terms; (2) the arbitration agreement is unenforceable due to procedural and substantive unconscionability; (3) Plaintiffs' challenges to the arbitration agreement are delegation clause specific and for the Court's determination; and (4) the scope of Plaintiffs' claims do not fall within the arbitration agreement. (ECF No. 16, at 9–23). Plaintiffs further assert, "Defendant's motion must be denied or at a minimum, deferred pending targeted discovery and an evidentiary hearing on contract formation and delegation." (ECF No. 16 at 6). Plaintiffs separately make various factual and legal arguments related to its contentions that this Court addresses in turn.

### a.  Arbitration Provision

Throughout the relevant period, A1 represents that their Platform required each user to complete a registration process and create an account prior to using the gaming application. (ECF No. 12-1, at ¶¶ 7–10). In order to complete the registration process, users had to accept the Terms of Use, which included an arbitration provision. (ECF No. 12-1, ¶¶ 7–8). Moreover, users accepted the Terms of Use by clicking a checkbox next to the following statement, "I accept the Funrize the [sic.] Terms of Use and Privacy Policy." (ECF. No. 12-1, at ¶ 10). The user then clicked a pink button labeled, "Get Started!" to complete the sign-up process. (ECF. No. 12-1, at ¶ 11). A1 contends the Terms were amended over time, including the relevant period, and every Platform user was required to agree to the amended Terms upon their next login. (ECF. No. 12-1,

at ¶¶ 14–18). A1's Director of A1 Development stated in his declaration, "[t]hough the exact language of the Terms may have varied; all versions of the applicable Terms during the relevant time period required arbitration of all past, present or pending, and future disputes. (ECF. No. 12-1, at ¶ 15). A1 further represents that Plaintiffs accepted and agreed to the December 4, 2023, Terms of Use (the "Terms of Use") (ECF. No. 12-1, at ¶ 19).

A1 alleges that the Terms of Use contained the following arbitration provision,

Specifically, all claims arising out of or relating to this Agreement (including its interpretation, formation, performance and breach), the parties' relationship with each other and/or your use of the website shall be finally resolved by binding arbitration. The arbitration shall be administered by the JAMS in accordance with the provisions of its Comprehensive Arbitration Rules or Streamlined Arbitrations Rules, as appropriate, excluding any rules or procedures governing or permitting class actions. This arbitration provision is made pursuant to a transaction involving interstate commerce. Accordingly, the Federal Arbitration Act (the "FAA") shall apply to the interpretation, applicability, enforceability and formation of this Agreement, notwithstanding the choice of law and forum selection provided for in Section 8, below.

(ECF No. 12-2, at 6). A1 contends the Terms of Use included the following statement regarding the Award Rules, "Additional eligibility requirements are disclosed in the Award Rules. You may access the Award rules of entertainment video games and promotional games with prize offers which are the part here of [sic.] by clicking HERE." (ECF No. 12-2, at 11).

Moreover, A1 contends the Terms of Use contained the following class action waiver,

The parties (you and A1 Development LLC) further agree that any arbitration and litigation allowed under this section 7 shall be conducted in their respective individual capacities only and not as a class action or other representative action. Accordingly, the parties expressly waive their right to file a class action or seek relief on a class basis. YOU AND A1 DEVELOPMENT LLC AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. If any court or arbitrator determines that the class action waiver set forth in this paragraph is void or unenforceable for any reason or that an arbitration can proceed on a class basis, then the arbitration provision set forth

20

above shall be deemed null, void in its entirety, the parties shall be deemed to have not agreed to arbitrate disputes, and the remainder of this Agreement shall survive and remain valid and enforceable.

(ECF No. 12-2, at 6–7). Finally, A1 alleges that Plaintiffs are customers and users of the

Platform and accessed the Platform on the following dates,

On or about February 28, 2025[,] Plaintiff Klein created a customer account and registered with A1 prior to playing any games, and Plaintiff last accessed the Platform on or about October 4, 2025. On or about May 11, 2025, Plaintiff Papp created a customer account and registered with A1 prior to playing any games, and Plaintiff last accessed the Platform on or about October 5, 2025. On or about January 22, 2024, Plaintiff Tanner created a customer account and registered with Al prior to playing any games, and Plaintiff last accessed the Platform on or about January 23, 2024.

(ECF. No. 12-1, at ¶ 17).

### b.  Standard of Review

Under the FAA, "[a] written agreement to arbitrate disputes arising out of a transaction in interstate commerce 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Javitch v. First Union Securities, Inc.,* 315 F.3d 619, 624 (6th Cir. 2003) (quoting in part 9 U.S.C. § 2). The FAA "[m]anifest[s] a 'liberal federal policy favoring arbitration agreements....'" *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985)). "The FAA was designed to override judicial reluctance to enforce arbitration agreements, to relieve court congestion, and to provide parties with a speedier and less costly alternative to litigation." *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000).

"[T]he FAA 'is at bottom a policy guaranteeing the enforcement of private contractual arrangements.'" *Id.*; *see Cooper v. MRM Investment Co.*, 367 F.3d 493, 498 (6th Cir. 2004). "Courts ... examine the language of the contract in light of the strong federal policy in favor of arbitration. Likewise, any ambiguities in the contract or doubts as to the

21

parties' intentions should be resolved in favor of arbitration." *Stout*, 228 F.3d at 714 (citations omitted). "Before compelling an unwilling party to arbitrate, the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Javitch*, 315 F.3d at 624. "[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

When resolving motions to compel arbitration, courts apply the summary judgment standard under Rule 56 of the Federal Rules of Civil Procedure particularly when the parties submit matters beyond the pleadings. *See Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002). Courts may consider both the pleadings and additional evidence submitted by the parties and view all facts and inferences in the light most favorable to the nonmoving party. *Id.* "The burden is on the party opposing arbitration to show that the agreement is not enforceable." *Townsend v. Stand Up Management*, No. 1:18CV2884, 2019 WL 3729266, at *2 (N. D Ohio Aug. 8, 2022) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91–92).

### c. Law and Analysis

#### i. Whether the Parties Agreed to Arbitrate

Plaintiffs' first argument against arbitration asserts that the Parties did not form a valid agreement to arbitrate due to a lack of assent as the records do not contain individualized acceptance records for each Plaintiff and there is a lack of proof of Plaintiffs' assent to the Terms of Use. (ECF No. 16, at 9–16). In determining whether the parties agreed to arbitrate, the court looks to state law principles that govern contract formation. *Seawright v. Am. Gen. Financial*

22

*Services, Inc.*, 507 F.3d 967 (6th Cir. 2007). A claim that an arbitration agreement was never formed negates one of the essential elements of a contract, mutual assent. *See* Restatement (Second) of Contracts § 17.

However, the agreement to A1's Terms as described above is known as a "clickwrap" agreement as it "require[s] the user to manifest assent to the terms by clicking on an icon." *Traton News, LLC v. Traton Corp.*, 528 F. App'x 525, 526 n.1 (6th Cir. 2013). "Ohio courts have held that clicking a 'clickwrap agreement' is an acceptable method to manifest assent to the terms of an agreement." *Clotz v. MobileHelp, LLC*, 2023 U.S. Dist. LEXIS 80384, at *9 (N.D. Ohio May 8, 2023) (quoting *Campinha-Bacote v. AT&T Corp.*, 2017-Ohio-5608, ¶ 13 (Ct. App.); *see also Tucker v. Santa Barbara Tax Prods. Grp., LLC*, 2023 U.S. Dist. LEXIS 61353, at *10–11 (N.D. Ohio Apr. 5, 2023). It is undisputed that Plaintiffs created accounts on Defendant's platform on the following dates:

> On or about February 28, 2025[,] Plaintiff Klein created a customer account and registered with A1 prior to playing any games, and Plaintiff last accessed the Platform on or about October 4, 2025. On or about May 11, 2025, Plaintiff Papp created a customer account and registered with A1 prior to playing any games, and Plaintiff last accessed the Platform on or about October 5, 2025. On or about January 22, 2024, Plaintiff Tanner created a customer account and registered with Al prior to playing any games, and Plaintiff last accessed the Platform on or about January 23, 2024.

(ECF. No. 12-1, at ¶ 17). Plaintiffs concede that Defendant's Platform contained a checkbox, the phrase, "I accept the Funrize the [sic.] Terms of Use and Privacy Policy," paired with a hyperlink to Terms of Use containing the arbitration, class waiver, and delegation provisions. (ECF No. 16, at 11). Although Plaintiffs repeatedly assert that they did not assent to the arbitration agreement, they do not dispute that they created accounts on Defendant's platform. (ECF No. 16 at 11–13).

23

Thus, by registering for Funrize accounts and continuing to use their accounts, Plaintiffs accepted the terms of Defendants' agreement. *See Ranazzi v. Amazon.com, Inc.*, 2015-Ohio-4411, ¶ 14 (6th Dist.) ("[B]y registering for an Amazon account and placing orders, [plaintiff] accepted the terms of [defendant's] agreements, including the arbitration provisions."); *see also GigSmart, Inc. v. AxleHire, Inc.*, 2023-Ohio-3807, ¶ 11 (1st Dist.) ("A requester does not need to click on the terms and conditions link to manifest assent, but rather agrees to be bound by the terms and conditions by signing up for an account."); *Adelstein v. Walmart Inc.*, 728 F. Supp. 3d 762, 768 (N.D. Ohio March 30, 2024) (finding clicking through relevant screens to be a method of assent to the terms of the arbitration agreement). Construing the facts in a light most favorable to the non-moving party, Plaintiffs manifested their assent to the Terms of Use through their conduct by creating accounts on Defendants' Platform. *See Martin v. Friedberg*, 2007-Ohio-3932, ¶ 19 (Ct. App.) ("A party can manifest his assent to a contract by written or spoken words, by his actions, or his failure to act.") (citation omitted). Therefore, there is a valid and enforceable arbitration agreement between the parties.

Moreover, Plaintiffs argue that Defendants lack specific proof of assent specifically, "acceptance logs, timestamps, IP or device identifiers, or version-control records linking any Plaintiff to any specific set of Terms, much less to the asserted December 2023 iteration containing the arbitration and class-waiver provisions." (ECF No. 16, at 10). As detailed above, it is uncontested that each Plaintiff created a Funrize account after December 2023 and Plaintiffs do not submit evidence to support that they did not assent to the arbitration provision found in the Terms of Use. (ECF No. 12-1, at ¶ 17); *see also In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 882 (6th Cir. 2021) ("[Plaintiffs] did not submit an affidavit declaring that either they did not receive the notification email or did not access their StockX accounts.").

24

Thus, this argument is unpersuasive, as Plaintiffs do not submit evidence to place their assent to the arbitration agreement into issue.

Furthermore, Plaintiffs' final contract formation argument concerns the alleged ambiguity of Defendant's clickwrap agreement. (ECF No. 16, at 11). Upon signup, Defendant's platform contained a checkbox, the phrase, "I accept the Funrize the [sic.] Terms of Use and Privacy Policy," paired with a hyperlink to terms containing the arbitration, class waiver, and delegation provisions. (ECF No. 16, at 11). Specifically, Plaintiffs contend, "[t]his text is grammatically defective and equivocal as to what the user is purportedly accepting." *Id.* However, A provision is ambiguous only if it is open to several possible meanings or interpretations. *Burris v. Grange Mut. Cos.,* 46 Ohio St.3d 84, 89 (1989). The existence of a scrivener's error does not render a term ambiguous. *Carter v. Dickerson,* 1990 WL 118878, *1 (Ohio App.1990).

Here, despite the minor grammatical error in the phrase "I accept the Funrize the [sic.] Terms of Use and Privacy Policy," the provision communicates that assent is being given to the hyperlinked Terms of Use and Privacy Policy. (ECF No. 16, at 11); *see Masco Corp. v. Wojcik*, 795 F. App'x 424, 429 (6th Cir. 2019) ("Unambiguous language does not become ambiguous simply because it could have been written even more unambiguously."). Accordingly, the grammatical error does not render the agreement ambiguous or otherwise unenforceable. Therefore, Plaintiffs' challenges regarding contract formation are unavailing.

### ii. Unconscionability

Plaintiffs' next challenge asserts that Defendant's arbitration clause is procedurally and substantively unconscionable. (ECF No. 16, at 16–19). The FAA provides that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for revocation of any contract." 9 U.S.C. § 2. "One such ground is unconscionability: If a

25

party shows that an agreement to arbitrate is unconscionable, the agreement will not be enforced and, consequently, the parties will not be compelled to arbitrate their disputes." *Dreher v. Eskco, Inc.*, No. 3:08-CV-325, 2009 WL 2176060, at *14 (S.D. Ohio July 21, 2009).

In Ohio, "[u]nconscionability includes both 'an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" *Taylor Bldg. Corp. of Am. v. Benfield*, 117 Ohio St.3d 352, 358 (2008) (quoting *Lake Ridge Acad. v. Carney*, 66 Ohio St.3d 376, 383 (1993)). The doctrine of unconscionability includes two separate concepts, (1) procedural unconscionability, or individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible, and (2) substantive unconscionability, or unfair and unreasonable contract terms. Under Ohio law, both elements must be present to find a contract unconscionable. *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 666 (6th Cir. 2003) (quoting *Jeffrey Mining Prods., L.P. v. Left Fork Mining Co.*, 143 Ohio App.3d 708 (Ohio Ct. App. 8th Dist. 2001)). "The party asserting unconscionability of a contract bears the burden of proving that the agreement is both procedurally and substantively unconscionable." *Taylor Bldg.*, 2008-Ohio-938, at ¶ 33.

Moreover, "[w]hen a party challenges an arbitration provision as unconscionable pursuant to R.C. 2711.01(A), the party must show that the arbitration clause itself is unconscionable. If the court determines that the arbitration clause is enforceable, claims of unconscionability that relate to the contract generally, rather than the arbitration clause specifically, are properly left to the arbitrator." *Taylor Bldg.*, 2008-Ohio-938, at ¶ 42.

26

### a. Procedural Unconscionability

In *Taylor Bldg.*, the court stated that,

Procedural unconscionability considers the circumstances surrounding the contracting parties' bargaining, such as the parties' "'age, education, intelligence, business acumen and experience … who drafted the contract …  whether alterations in the printed terms were possible, [and] whether there were alternative sources of supply for the goods in question.'"

"Factors which may contribute to a finding of unconscionability in the bargaining process [i.e., procedural unconscionability] include the following: belief by the stronger party that there is no reasonable probability that the weaker party will fully perform the contract; knowledge of the stronger party that the weaker party will be unable to receive substantial benefits from the contract; knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of physical or mental infirmities, ignorance, illiteracy or inability to understand the language of the agreement, or similar factors." Restatement of the Law 2d, Contracts (1981), Section 208, Comment d.

*Taylor Bldg.*, 2008-Ohio-938, at ¶ 44. Plaintiffs' procedural unconscionability argument primarily concerns Defendant's "Official Award Rules," as Plaintiffs contend the rules are procedurally unconscionable as the rules were "neither presented to users, nor linked at signup, nor referenced in the assent mechanism." (ECF No. 16, at 16). Defendant represents that the Terms of Use, those viewed by Plaintiffs when creating their accounts, included the Award Rules by reference in the form of a hyperlink. (ECF No. 12-2, at 11) (Additional eligibility requirements are disclosed in the Award Rules. You may access the Award rules of entertainment video games and promotional games with prize offers which are the part here of [sic.] by clicking HERE).

However, Plaintiffs repeatedly describe the Award Rules as "withheld" and "hidden," yet fail to present evidence to establish that the award rules were inaccessible or otherwise concealed. (ECF No. 16, at 16–18). Plaintiffs do not discuss the procedural unconscionability factors noted above. (ECF No. 16, at 16). Plaintiffs make no allegations of any issue regarding general education or intelligence. (ECF No. 16, at 16). There is also no indication that Plaintiffs

27

were unable, because of time or mental capability, to read and comprehend the agreement. *See Hurst v. Enter. Title Agency, Inc.*, 2004-Ohio-2307 (11th Dist.). (ECF No. 16, at 16). Additionally, under Ohio law, separate agreements may be incorporated by reference into a signed contract. *See Keybank National Association v. Southwest Greens of Ohio, L.L.C.*, 988 N.E.2d 32, 39 (Ohio Ct. App. 2013). Moreover, "[a] party need not have received or read a document incorporated by reference in order for it to be binding." *Kordel v. NCR Corp.*, 2009 WL 10713927, *5 (N.D. Ohio Sept. 15, 2009). Plaintiffs present no evidence that the award rules were inaccessible through the hyperlink, or otherwise unavailable. Therefore, the Plaintiffs unsupported contentions regarding the "hidden" award rules are unavailing. Thus, Plaintiffs have not met their burden of establishing procedural unconscionability.

As Plaintiffs did not meet their burden of establishing procedural unconscionability, this Court will not address substantive unconscionability. *See Maynard v. Valley Christian Academy, Inc.*, 2017 WL 3594670, *8 (N.D. Ohio Aug. 21, 2017); *see* also *Dantz v. Am. Apple Group, LLC.*, 123 Fed. Appx. 702, 709 (6th Cir. 2005) (since the court found a lack of procedural unconscionability, the court indicated that it need not reach the issue of substantive unconscionability).

### iii.    Arbitration versus Judicial Review

Next, Plaintiffs attempt to frame their remaining challenges as directed solely at the arbitration provision in order to avoid enforcement of the delegation clause. (ECF No. 16, at 20). However, the FAA reflects the principle that arbitration is a matter of contract. As a contract, the FAA "allows parties to agree that an *arbitrator*, rather than a court, will determine 'gateway questions of arbitrability, such as whether the parties have agreed to arbitrate'" a dispute, *Swiger v. Rosette*, 989 F.3d 501, 505 (6th Cir. 2021) (emphasis added) (internal quotation marks

28

omitted) (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)). This type of agreement is known as a "delegation clause," and it "requires 'clear and unmistakable' evidence that the parties agreed to have an arbitrator decide' arbitrability." *Id.* (internal quotation marks omitted) (quoting *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 844 (6th Cir. 2020)).

In *Rent-A-Center*, the Supreme Court analyzed a delegation provision with language similar to the Terms of Use finding clear and unmistakable evidence the parties agreed to have an arbitrator decide' arbitrability. 561 U.S. 63. In the case, the Supreme Court found as valid the parties' agreement that, "[t]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable." 561 U.S. at 66, 72–76. In the present case, the Terms of Use stated, "[t]he arbitrators, and not any federal, state, or local court or agency, shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of this Agreement, including without limitation any claim that all or any part of this Agreement is void or voidable, or whether a claim or dispute is subject to arbitration." (ECF. No 12-2, at 6). Thus, this Court finds there is clear and unmistakable evidence that the arbitration agreement expressly delegated issues of arbitrability to the arbitrator. Therefore, the arbitrator shall determine issues of arbitrability.

Yet the fact that the parties have clearly and unmistakably entered into a delegation provision does not mean that delegation provision cannot be challenged. *See Rent-A-Ctr.*, 561 U.S. at 71. "If a party challenges the validity under § 2 [of the FAA] of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering

29

compliance with that agreement," and the same is true for a challenge to the validity of a delegation provision. *see Becker v. Delek U.S. Energy, Inc.*, 39 F.4th 351, 355 (6th Cir. 2022) ("Attacking a delegation provision as invalid turns the question away from arbitrability of gateway issues to the validity of an arbitrator's authority to arbitrate arbitrability.... If the validity of a delegation provision is challenged in response to a motion to compel arbitration, then the court, rather than the arbitrator, must address those challenges."). A challenge to a delegation provision must be "directed *specifically* to the delegation provision," meaning "a party's challenge to a delegation clause must rest, in part, on [a] different factual or legal ground than the ones supporting its challenge to the arbitration agreement as a whole." *Becker*, 39 F.4th at 356 (emphasis added). When a party fails to challenge a delegation provision specifically, the Court defers the question of arbitrability to an arbitrator.

Each of Plaintiffs' remaining challenges concern expressly delegated issues of arbitrability that Plaintiffs present as challenges to the delegation provision. Plaintiffs contend, "… its combination of individual arbitration requirement, distant Philadelphia forum, Pennsylvania choice-of-law provision, categorical class/representative ban, and poison-pill severability." (ECF No. 16, at 20). Plaintiffs also argue, "… [the] unconscionability and public policy challenges are likewise clause-specific. The arbitration provision's procedural defects (defective assent mechanism, undisclosed Award Rules, adhesive presentation) and substantive one-sidedness (distant forum, foreign law, class ban, poison pill) appear in the arbitration provision itself." (ECF No. 16, at 20). Plaintiffs believe these arguments are specific to the arbitration clause and should be decided by this Court, not the arbitrator. (ECF No. 16, at 20).

However, Plaintiffs' first set of challenges, concerning the arbitration agreement's "… combination of individual arbitration requirement, distant Philadelphia forum, Pennsylvania

choice-of-law provision, categorical class/representative ban, and poison-pill severability" do not uniquely target the delegation provision itself, but instead challenge the arbitration agreement as a whole by attacking the fairness and enforceability of its Terms of Use. (ECF No. 16, at 20). Here, Plaintiffs' arguments regarding the distant forum, choice-of-law provision, class action waiver, and severability mechanism are directed at the overall arbitration framework rather than the agreement to delegate arbitrability. (ECF No. 16, at 20). Because Plaintiffs do not identify any independent basis upon which the delegation provision itself is invalid these arguments fall within the category of issues the parties agreed to arbitrate. *See Becker*, 39 F.4th at 356. Accordingly, the Court must enforce the delegation provision and refer Plaintiffs' remaining challenges to the arbitrator.

Plaintiffs' second set of challenges concern unconscionability, specifically procedural defects and substantive one-sidedness also remain with the arbitrator. As detailed above, Plaintiffs failed to meet their burden and establish unconscionability and "[w]hen a party challenges an arbitration provision as unconscionable pursuant to R.C. 2711.01(A), the party must show that the arbitration clause itself is unconscionable. If the court determines that the arbitration clause is enforceable, claims of unconscionability that relate to the contract generally, rather than the arbitration clause specifically, are properly left to the arbitrator." *Taylor Bldg.*, 2008-Ohio-938, at ¶ 42. Plaintiffs again renew challenges of procedural unconscionability, (defective assent mechanism, undisclosed Award Rules, adhesive presentation), and substantive unconscionability (distant forum, foreign law, class ban, poison pill). (ECF No. 16, at 20). Yet, Plaintiffs attempt to convey these alleged procedural and substantive defects render the arbitration provision itself unconscionable while still failing to allege any specific challenge to the delegation provision. Yet, these contentions address the fairness and operation of the

arbitration agreement as a whole, not the delegation provision. *See Rent-A-Ctr.*, 561 U.S. at 73 (reasoning courts need not consider an unconscionability challenge when it is not specific to the delegation provision). Accordingly, because Plaintiffs' unconscionability arguments are not specifically directed at the delegation provision, those arguments must be decided by the arbitrator pursuant to the parties' agreement.

In sum, under the FAA, "a valid delegation provision removes judicial purview and transfers the question of arbitrability to an arbitrator." *See Becker*, 39 F.4th at 355. Because Plaintiffs do not specifically attack the delegation provision, the Court will not disturb the parties' decision to defer issues of arbitrability to an arbitrator.

### iv.    Scope of Claims

Finally, Plaintiffs contend that their claims fall outside the scope of the arbitration clause because the Official Award Rules were allegedly undisclosed and therefore never assented to. (ECF No. 16 at 21–22). Yet, as detailed above, the Award Rules were incorporated by reference through a hyperlink located in the Terms of Use. Additionally, the arbitration provision in the Terms of Use covers, "all claims arising out of or relating to this Agreement (including its interpretation, formation, performance and breach), the parties' relationship with each other and/or your use of the website shall be finally resolved by binding arbitration." (ECF No. 12-2, at 6). Plaintiffs' claims arise directly from their interactions with Defendant's platform, including gameplay and attempted redemptions of "sweep coins." (ECF No. 1, ¶¶ 17, 18, 32, 37, 38). Generally, Plaintiffs' claims directly relate to Defendants' alleged illegal online gambling application and alleged misrepresentations concerning Defendants' award rules. (ECF No. 1, at 14–19). Resolving all doubts about the scope of arbitrable issues in favor of arbitration, the Court finds that Plaintiffs' claims fall within this language and are covered by the Terms of Use. *See*

32

*Javitch v. First Union Secs., Inc.*, 315 F.3d 619, 625 (6th Cir. 2003) (citing *Moses H. Cone Mem'*

*Hosp.*, 460 U.S. at 24-25).

## VI. Recommendation

Based on the foregoing, it is RECOMMENDED that the Court DENY Defendant's Motion

to Dismiss and GRANT Defendant's Motion to Compel Individual Arbitration.

Dated: April 21, 2026

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

---

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530-31 (6th Cir. 2019).